AO 106 (Rev. 01/09) Application for a Search Warrant

**SEALED**

# UNITED STATES DISTRICT COURT

### for the
### Southern District of California

FILED

2009 APR -8 AM 9: 05

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| SHIDAAL EXPRESS | ) |
| 4348 54TH STREET, SAN DIEGO, CALIFORNIA | ) |
| | ) |

Case No.

'09 MJ 1141

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Southern_____ District of _____California_____ *(identify the person or describe property to be searched and give its location):* Shidaal Express, 4348 54th Street, San Diego, California
(as further described in Attachment A-1)

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):* **See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of __18__ U.S.C. § __371__ , and the application is based on these facts: Search is also related to a violation of 18 U.S.C. Section 1956(a)(2)(A) and 31 U.S.C. Section 5324

See Attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael C. Kaiser, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __4-7-09__

_____
*Judge's signature*

City and state: San Diego, California

Nita L. Stormes, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

**I.      INTRODUCTION**

I, Michael C. Kaiser, being duly sworn, depose and state:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the San Diego Division.   I have been so employed since October 19, 2003.   Since June 2007, I have been assigned to investigate counterterrorism matters, including criminal violations relating to providing material support to terrorists and designated Foreign Terrorist Organizations (FTOs), conspiracy to kill or maim persons in foreign countries, and money laundering.

2.      This Affidavit is made in support of an application by the United States of America for warrants to search the premises of Shidaal Express, located at 4348 54th Street, San Diego, California, and 4877 University Avenue, San Diego, California, as further described in Attachments A-1 and A-2, respectively, for evidence of violations of 18 U.S.C. § 371 (conspiracy to commit offenses against the United States); 18 U.S.C. § 1956(a)(2)(A) (money laundering), and 31 U.S.C. § 5324 (structuring to evade reporting or record keeping requirements), as described in Attachment B.

3.      The facts set forth in this Affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers and linguists, and review of public, commercial, and law enforcement records and reports.

4.      Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.   I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of the aforementioned offenses is located on the premises

described in Attachments A-1 and A-2. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part. Foreign language statements are set forth based on draft summary translations or transcripts by FBI language specialists. Certain foreign language words and names are spelled phonetically and, therefore, with some variation by the language specialists.

5.      The investigation has revealed that BASAALY SAEED MOALIN and others have coordinated the transfer of funds to support al-Shabaab, a violent extremist group operating in Somalia that has been designated by the U.S. Secretary of State as a Foreign Terrorist Organization (FTO) and a Specially Designated Global Terrorist (SDGT). The funds have been transferred from the United States to Somalia via Shidaal Express, a money remitting business that operates through an informal money transfer system called a "hawala." The investigation also has provided probable cause to believe that MOALIN and others–including employees of Shidaal Express–have structured transactions and used false names to evade reporting and record-keeping requirements.

## II.     BACKGROUND

### A.     Background on Somalia

6.      For at least the past fifteen years, Somalia has lacked a stable government and has been vulnerable to intense civil and sectarian violence. In 2004, the Transitional Federal Government (TFG) was established under international auspices. A loose coalition of Islamic insurgents known as the Islamic Courts Union (or Council of Islamic Courts) (ICU) fought against the TFG, however, and took control over much of southern Somalia. In early June 2006, the ICU captured Somalia's capital city Mogadishu, and the TFG retreated to Baidoa, Somalia. The ICU, together with an extremist faction known as al-Shabaab, continued to fight the TFG in

Baidoa. While in control of southern Somalia, the ICU and al-Shabaab are believed to have provided protection and safe haven for al-Qaeda operatives wanted for the 1998 bombings of the United States embassies in Kenya and Tanzania and a 2002 hotel bombing in Kenya.

7.      In late 2006, Ethiopian forces intervened on the TFG's behalf, routed the ICU and recaptured Mogadishu. With Ethiopian and African Union support, the TFG was reinstalled into power.  Although it initially dispersed in the face of the Ethiopian invasion, al-Shabaab eventually regrouped and initiated a war in Somalia targeting all aspects of the TFG, including police stations, border posts, government facilities and civilian targets, as well as the TFG's Ethiopian and African Union supporters.  Al-Shabaab captured several cities and towns in southern Somalia, including parts of Mogadishu itself.  In addition to fighting against the TFG, al-Shabaab also opposed two autonomous regions of northern Somalia known as Puntland and Somaliland.  In late 2008 and early 2009, Ethiopia began to withdraw its troops from Somalia, and al-Shabaab advanced against the TFG.  In late January 2009, al-Shabaab captured Baidoa, and TFG control was reduced to several square blocks in Mogadishu protected by African Union peacekeepers.

8.      Throughout its war against the TFG and its Ethiopian and African Union supporters, al-Shabaab has used harassment and targeted assassinations of civilians and journalists, improvised explosive devices, rockets, mortars, automatic weapons and general tactics of intimidation and violence to undermine the Somali government, quell the Somali population, and force the withdrawal of foreign troops.  In late 2008, for example, al-Shabaab produced a videotape depicting the slow decapitation of an accused spy.  Al-Shabaab has claimed responsibility for multiple suicide bombing attacks, including an attack on Burundian peacekeepers in Mogadishu on April 8, 2008; five simultaneous suicide bombings targeting TFG,

3

Ethiopian and United Nations facilities in Puntland and Somaliland on October 29, 2008; and another suicide attack against Burundian peacekeepers on February 22, 2009. Al-Shabaab has declared that its ultimate goal is the imposition of Sharia (strict Islamic law) throughout Somalia.

9.     Al-Shabaab's former leader, Aden Hashi Ayrow, who had trained with al-Qaeda in Afghanistan prior to 2001, called for foreign fighters to join al-Shabaab in a "holy war" against the Ethiopian and other African forces in Somalia. Ayrow's call was echoed by al-Qaeda leadership, including Usama bin Laden and Ayman al-Zawahiri, and fighters from other countries – including the United States – have traveled to Somalia to engage in violent jihad. (The international press reported that Ayrow was killed in a missile strike in Somalia on May 1, 2008.)

10.    On or about February 29, 2008, the U.S. Department of State designated "Al-Shabaab" as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act, as amended, and as a Specially Designated Global Terrorist (SDGT) under Section 1(b) of Executive Order 13224, as amended. The designation remains in effect as of this date. Under the designation, al-Shabaab is also known as (a/k/a) al-Shabab, Shabaab, Mujahidin al-Shabaab Movement, Mujahidin, MYM, Harakat Shabab al-Mujahidin, Hizbul Shabaab, Hisb'ul Shabaab, al-Shabaab al-Islamiya, al Shabaab al-Islaam, al-Shabaab al-Jihaad. "Al-Shabaab" is an Arabic word that loosely translates to "the Youth" and is used commonly in the Somali language. Thus, al-Shabaab and its members and affiliates are commonly referred to, and known as: "the Youth," "the young ones," "the orphans" "the Youth Movement," "the Youth Wing", and "the Unity of Islamic Youth."

**B.    Background on Hawalas and Shidaal Express**

11.    Hawalas are alternative money remittance systems that consist of a network of

money brokers who transfer funds on behalf of customers to recipients in other countries.
Because Somalia does not have a strong conventional banking system, the hawala system is used
by many Somalis in the United States and elsewhere to send and receive money to individuals in
Somalia. While hawalas may be licensed to operate in the United States and may use United
States financial accounts to make monetary transfers and remittances overseas, they also operate
with a reduced and less formal paper trail and among trusted connections. For this reason, the
hawala network has historically been favored by those involved in financing or transferring the
proceeds of criminal activity, including terrorism. In the course of their operations, hawalas use
telephones, computers, and the internet to effectuate the money transfers.

12.     Shidaal Express is a money remitting business and hawala with at least two
offices located in San Diego. Shidaal Express largely serves the Somali community. An
Autotrack XP (formerly Choicepoint) database check conducted on July 11, 2008 revealed that
Shidaal Express is owned by MOHAMUD A. AHMED, doing business as Shidaal Express,
Incorporated and Shidaal Investment Group LLC with an address of 4348 54th Street, #A, San
Diego, California. An Autotrack XP "Business Directory" search revealed that there is also a
Shidaal Express money transfer business located at 4877 University Avenue, San Diego,
California. According to an open source business profile obtained through an online search,
Shidaal Express is a "leading money transfer (sic) in Africa and expanding through out (sic) the
USA." Shidaal Express was registered as a Money Services Business with the U.S. Department
of Treasury (FinCEN Form 107) in January 2007.

13.     An Autotrack XP database check also revealed that AHMED has been a registered
agent of Amal Express with an address of 4348 54th Street, San Diego, California (the same
street address as Shidaal Express). The Amal Express website described Amal Express as the

5

"largest Somali public company in the Somali Xawala (Remittance) business with worldwide network of associate companies and agencies."

14.     I am informed and believe that money transmitters such as Shidaal Express have reporting and record keeping requirements under federal law, including: (1) a requirement to report to federal authorities suspicious transactions that involve or aggregate funds of at least $2,000; and (2) a requirement to keep certain records, such as the name and address of the transmittor, with respect to a transmittal of funds in the amount of $3,000 or more. [31 CFR §§ 103.20, 103.33.] Title 31, United States Code, Section 5324 prohibits the structuring of transactions to evade reporting or record keeping requirements.

15.     Furthermore, under Title 18, United States Code, Section 1956(a)(2)(A), it is a crime to transfer funds from a place in the United States to a place outside thereof to promote the carrying on of specified unlawful activity.  "Specified unlawful activity" includes conspiracy to kill or maim persons in a foreign country and providing material support to terrorist organizations.

## III.    INVESTIGATION AND PROBABLE CAUSE

16.     BASAALY SAEED MOALIN, who currently resides in San Diego, was born in Somalia and became a naturalized United States citizen in July 2002.  MOALIN uses cellular telephone number (619) 278-1189, which is subscribed to by an individual named WARSAME MOALIM.  This affiant confirmed MOALIN's association with (619) 278-1189 through a State of California law enforcement database (ARJIS) check, which  revealed that an individual named BASAALY SAEED MOALIN reported a stolen property incident and provided a home and work contact telephone number of (619) 278-1189.  The FBI also has conducted real-time surveillance of MOALIN while he participated in a telephone call on that number.  Throughout the remainder

6

of this affidavit, all references to telephone calls involving MOALIN refer to calls either dialed from or received on (619) 278-1189.  When speaking with others on this line, MOALIN is regularly referred to as "Basaaly".[1]

### A.    MOALIN's Contact with AYROW

17.    In 2007 and 2008, MOALIN was in telephone contact with an individual he called "Shiqalow" and identified as a leader of "the Youth" (al-Shabaab).  For example, on January 3, 2008, MOALIN called Shiqalow at a Somali telephone number.  Shiqalow described fighting in the vicinity of Adaado, a town in Somalia, involving armed bandits who were Abdullahi Yusuf's men.  During the conversation, MOALIN told Shiqalow that a scholar known as "Moalin (teacher) Abdirahman" was calling him from Dhusa Mareb, another area in Somalia.  After ending the call with Shiqalow, MOALIN had a telephone conversation with an individual whom MOALIN addressed as "Moalin", who called from a Somali telephone number.  MOALIN told this individual that he had just been talking with a man who is one of "the Youth" and that this man had told MOALIN that the fighting in Adaado was between Abdullahi Yusuf's men and "the Youth."

18.    On January 4, 2008, MOALIN received a call from a St. Louis-based ethnic Somali male (hereafter, the "St. Louis contact").  After asking the St. Louis contact if the situation in Adaado had been resolved, MOALIN said that he had spoken with the young man who was the head of the Youth and the young man had told MOALIN what had happened in Adaado.

19.    On May 1, the same day on which Ayrow was killed, the St. Louis contact called

---

[1]    To the extent this affidavit refers to telephone communications involving MOALIN, the communications were intercepted under orders issued by one or more United States District Judges.

MOALIN and told him that he had received information indicating that the house where Shiqalow resides was attacked by "birds". This affiant has reviewed a BBC report, published May 1, 2008, concerning a U.S. missile strike on the home of ADEN HASHI AYROW, further identified as the military head of al-Shabaab. The BBC report described an interview with al-Shabaab spokesman MUKHTAR ROBOW, who told BBC that Ayrow was killed. Further, although MOALIN and Shiqalow were in telephone contact at least 21 times between December 21, 2007 and April 26, 2008, no contacts between the two were intercepted after May 1, 2008.

20.    Considering that AYROW was a leader of al-Shabaab in Somalia, that MOALIN was in contact with Shiqalow at a Somali telephone number, that MOALIN referred to Shiqalow as the head of the "the Youth" and one of "the Youth", that AYROW's death coincided with the St. Louis contact's reference to Shiqalow being attacked by "birds", and that MOALIN had no further contact with Shiqalow after AYROW's death, your affiant submits that Shiqalow was AYROW, a leader of al-Shabaab, and I refer to Shiqalow as AYROW in all further references below.

21.    Morever, there is probable cause to believe that MOALIN knows that al-Shabaab has been designated an FTO by the United States. On March 19, 2008, MOALIN received a telephone call from a Somali male identified as "Indho". Indho asked MOALIN if he had any news from Somalia. MOALIN answered that a BBC radio report stated that the U.S. had added al-Shabab to its list of terrorist organizations.

### B.    MOALIN's Material Support to al-Shabaab

22.    On December 21, 2007, MOALIN received a call from AYROW. AYROW said that "the enemy was hurt a lot lately" and asked for news. AYROW also asked MOALIN to send approximately $3,160.00 in the next ten days "because there is not even money for food".

MOALIN said that he would "take care of the issue with help from Sheikh Issa."

23.      After the call from AYROW ended, MOALIN called an individual at (619) 549-3197, which is a cellular telephone number subscribed to by ISSA MOHAMED DOREH.[2] During the telephone conversation with DOREH, MOALIN stated that he had received a call from the "guy" who was asking for money. MOALIN also told DOREH that approximately $3,600.00 was needed for the Baidoa area. MOALIN said the guy told MOALIN that the daily cost for the troops fighting in that area was $1.00 per person. MOALIN said that they must support the "guy" and all the people who were performing such an important task.

24.      On December 28, 2007, MOALIN called DOREH at (619) 549-3197. MOALIN told DOREH (addressing him as "Sheikh Issa") that "Sheikh Mohamed" promised to send something this month, but that MOALIN was worried it would come too late. MOALIN asked DOREH to contact Sheikh Mohamed at the mosque.

25.      On January 1, 2008, MOALIN called DOREH at (619) 549-3197 and the two discussed the collection of money for members of their sub-clan in Somalia. MOALIN suggested that DOREH become the central point to whom everyone would bring money. DOREH agreed and said that it would not be a problem.

26.      On January 18, 2008, MOALIN called an unidentified Somali male and told him that there was a fund raised by the community to "kill these men." The unidentified Somali male asked who was the sender of the funds and MOALIN replied that it was Sheikh ISSA DOREH.

---

[2]      DOREH has been observed frequently at the Shidaal Express office located at 4877 University Avenue, San Diego, California and was videotaped on July 8, 2008, leaving the office, going to the Masjid al-Ansar mosque and then returning to the office with an envelope in his hand. Furthermore, according to an inquiry with the State of California Employment Development Department in 2008, DOREH had been paid as an employee of Shidaal Express during the first two quarters of that year.

27.     On February 9, 2008, MOALIN received a call from DOREH.  MOALIN told

DOREH that "he" was expecting something from the people.  MOALIN asked DOREH if "it"

had reached him.  DOREH answered that if MOALIN was referring to the one that MOALIN

sent with MOHAMED KHADAR, that the money had been sent to someone named "Dhunkaal."

 DOREH referred to the transaction as "two."

28.     On February 14, 2008, MOALIN received a call from AYROW, who was using

Somali number 252-152-09957.  MOALIN asked AYROW if he had received "two messages"

from Dhunkaal.  AYROW asked which company was used and MOALIN replied that it was the

Amal.  MOALIN then told AYROW that the recipient name for the transfer was YUSUF

MOHAMED ALI.  AYROW told MOALIN that AYROW would go look for it and then asked

MOALIN if it was 2,000.  MOALIN confirmed that it was 2,000.  AYROW said that he did not

receive it but would go look for it now.  MOALIN said that he used the new telephone number

previously provided by AYROW but that he sent it to Dhunkaal's account.  Based on the context

of the call and MOALIN's previous call with DOREH, I believe that MOALIN and AYROW

were discussing a transfer of approximately $2,000 from MOALIN and KHADAR in the United

States through Shidaal/Amal to AYROW in Somalia.  Based on the context of this call and other

calls, I believe that "Dhunkaal" is a false name often used by MOALIN and his associates when

transmitting money to al-Shabaab.

29.     On April 23, 2008, MOALIN called Shidaal Express at (619) 583-0871 and spoke

with an employee named Abdirizak.[3]  MOALIN asked whether two money transfers of $1,000

had been paid out in Guraceel, Somalia yet.  Abdirizak said that he would check his records.

---

[3]     During an interview with FBI agents in January 2009, Abdiaziz Aden Hussein,
aka Abdirizak Hussein, confirmed that he is an employee of Shidaal Express.

While Abdirizak was checking, he told MOALIN that the last transfer of $3,000 to Dhunkaal had

not been paid out yet. MOALIN then called an individual addressed as "Sheikh Mohamed" and

asked if the money was sent to Dhunkaal. After Sheikh Mohamed confirmed the money had

been sent, MOALIN asked Sheikh Mohamed which name had been used. Sheikh Mohamed said

that the name was "Abdi Nasir." After MOALIN terminated the call, he called DOREH and

asked if DOREH was in his office. MOALIN told DOREH that the names used for the money

transfer might be wrong. MOALIN asked if DOREH could tell MOALIN the names (sender and

recipient) that were used for the money transfer. DOREH answered that he could not log into the

website because he did not have an account.   Approximately twelve minutes later, MOALIN

called DOREH again. DOREH informed MOALIN that the recipient name used for the money

transfer was "Dhunkaal Mohamed Yusuf" and that the sender name was "Abdiwali Ahmed"

(phonetic). DOREH said that "Dhunkaal" is the "client there who we always send it to...he is the

receiver." DOREH said that he was with Abdirizak and that the money transfer information

could be changed if MOALIN so desired. MOALIN asked that the transfer location be changed

to Dhusa Mareb, Somalia, the current location of the recipient.

      30.     On April 24, 2008, AYROW called MOALIN. MOALIN asked AYROW if he

had received the "little that we sent you?" AYROW replied that he had been away for three days

and that he was nearing the city now. AYROW asked if MOALIN had sent "it" to Dhusa Mareb

and MOALIN answered, "yes." MOALIN told AYROW that the company used was Amal and

that the indicated recipient was "Dhunkaal Yusuf Mohamed". MOALIN referred to the money

transfer as "three children" that were sent from San Diego. MOALIN warned AYROW that the

remitter might have divided the transfer in parts to hide the full amount, but that the recipient

name was the same (as before).

31. On April 25, 2008, MOALIN called AYROW. MOALIN asked AYROW how much of the money he had received so far. AYROW answered, "19." MOALIN told AYROW to look for "11" and that the total amount was "three grants." MOALIN explained to AYROW that at first the money had been directed to a big city but then MOALIN found out AYROW was "in the north" so he asked the hawala to re-direct the money transfer. MOALIN said that the hawala does not charge the fee they normally charge people. MOALIN told AYROW that the head of the "place" was the man who had spoken to AYROW, Sheikh ISSA DOREH.

32. After his call to AYROW on April 25, 2008, MOALIN called Abdirizak at Shidaal Express about the "issue with Dhunkaal." MOALIN asked Abdirizak if the money transfer was sent to two recipients. Abdirizak said that "one was for 19 and the other for 11." MOALIN told Abdirizak that "they had received the one for 19" and asked Abdirizak to check whether the other one was still outstanding. Abdirizak confirmed that the other money transfer had not been picked up yet. Abdirizak also told MOALIN that the recipient's name was switched to "Mohamed Yusuf Dhunkaal" instead of "Dhunkaal Mohamed Yusuf" and that the sender was indicated as "Sahra Warsame." Abdirizak told MOALIN that the money transfer was sent to Dhusa Mareb and that it was for "1,100."

33. On April 26, 2008, MOALIN attempted to contact AYROW at a Somali telephone number. AYROW told MOALIN to call him back in three minutes. When MOALIN did so, the telephone was answered by an unidentified Somali male. MOALIN asked to speak to the teacher and the unidentified male told MOALIN that the teacher was busy and to call back later. After this date, no further telephone communications between MOALIN and AYROW were intercepted.

34. There is probable cause to believe that, following AYROW's death, MOALIN

12

and his associates continued their efforts to provide material support to al-Shabaab via the Shidaal Express. For example:

- On May 8, 2008, during a telephone conversation with a male identified as "Mahad," MOALIN stated that he and others were trying to send financial support to the cause, but because their main contact was no longer in the area, they needed to identify another person to receive the support.

- On May 31, 2008, during a telephone conversation with MOHAMED ABDI YUSUF, MOALIN stated that they use an account named "Dhunkaal" to send funds. (As described in paragraph 28, above, "Dhunkaal" was the name used to send funds to AYROW via the Shidaal Express.) YUSUF told MOALIN that, when "Thin Limbs" died, the Youth contacted YUSUF and told him that they were "orphans." MOALIN explained that this individual was a lower leader who responded to ROBOW and that the money collection and the communication are still continuing. Your affiant knows from extensive, open-source reporting that Mukhtar ROBOW (aka "Abu Mansur") is a high-ranking spokesman and military commander for Al-Shabaab.

- On June 2, 2008, during a telephone conversation with a Somali male named "Najib," MOALIN stated that ROBOW is a real leader and his only boss.

- On July 8, 2008, during a telephone conversation with a Somali male identified as "Ugaas," MOALIN stated that he already sent $5000 to the Galgaduud region and $500 to Mogadishu, and that when he collects the

13

rest from the people who did not pay, he will send that money to al-
Shabaab.

- On July 18, 2008, during a telephone conversation, MOALIN asked
  AHMED (the operator of Shidaal Express) whether he received $2,000
  that MOALIN left at the hawala.  AHMED confirmed that he received the
  money.  MOALIN told AHMED that the payee is "Dhunkaal," the usual
  name that he uses in these cases.

- On July 18, 2008, during a telephone conversation with an individual,
  MOALIN stated that their "top guy" in San Diego received a visit from the
  "three letters" and that the top guy has given instructions to keep a low
  profile.  MOALIN stated that they will keep supporting the Youth and
  their people in need.

- On July 23, 2008, during a telephone conversation with an unidentified
  male, MOALIN stated that he sent "two cartons to the little ones."
  Because al-Shabaab means "the Youth," I believe that "the little ones" is a
  reference to al-Shabaab.

- On August 3, 2008, during a telephone conversation,  ABDIRIZAK (a
  Shidaal Express representative) told MOALIN that he sent the transfer of
  the two amounts of $860 and $350, but the old guy told him that the
  transfer fee was not paid.  MOALIN replied that the money was for the
  support of "those men."  ABDIRIZAK then told MOALIN not to worry,
  because if that is the case, ABDIRIZAK will pay the fees.

- On September 14, 2008, after hearing a news report that Al-Shabaab was

14

threatening to attack the Mogadishu International Airport, MOALIN told

"Najib" over the telephone that MOALIN fully supports whatever action

Al-Shabaab takes.

35.     On October 28, 2008, a search warrant was executed on EZOT, an Internet

Service Provider for the Shidaal Express, to obtain money transaction records for the Shidaal

Express. Business records obtained from the search confirmed that Shidaal conducted business

via email and the Internet, but only partial money transaction records (essentially March 2008,

April 2008, and June 2008) were found in the EZOT search. Significantly, the EZOT search

warrant yielded a spreadsheet referencing the $1,100 and $1,900 transfers described in

paragraphs 30 through 32 of this Affidavit. Accordingly, this affiant believes that obtaining the

records of Shidaal Express money transactions for the missing months would confirm other

activities of material support to terrorists, such as those described in paragraphs 23 through 28

and 34.

36.     Additionally, based on the facts previously set forth, there is probable cause to

believe that MOALIN and the employees of Shidaal Express frequently use a variety of false

names to conceal the identities of the actual sender and receiver of funds transmitted to Somalia.

In fact, on June 2, 2008, during a telephone conversation with MOALIN, an individual in

Somalia identified as "Sharif" told MOALIN that he could not withdraw the money from the

hawala because he did not know the sender named used by MOALIN to transmit the money.

MOALIN replied that he did not know the name used by the hawala office to send the money,

but that he would check in the morning. MOALIN explained that he did not want his own name

on record because he sends a lot of money and does not want trouble with the authorities.

Although the obvious use of false names should trigger suspicious activity reporting for

transactions involving or aggregating $2,000 or more, a check of FinCEN records in March 2009 did not reveal any suspicious activity reports filed by Shidaal Express for the transactions referenced in this affidavit. Furthermore, as described in paragraph 29 through 32 of this affidavit, there is probable cause to believe that MOALIN and his associates structure the transmission of funds to Somalia to stay below the $3,000 record keeping requirement.

37. Because of the affirmative efforts of MOALIN and his associates to confuse law enforcement authorities and evade reporting and accurate record-keeping requirements, it will be necessary to carefully analyze all the Shidaal transaction data and records obtained pursuant to this requested search warrant to identify evidence of the criminal offenses described herein.

IV.   **COMPUTER SEARCH PROTOCOL**

38. With the approval of the Court in signing the warrant, the agents executing the search warrant will employ the following procedures regarding computers that may be found on the premises which may contain information subject to seizure pursuant to this warrant:

Forensic Imaging

a. After securing the premises, the executing agents will consult with a computer specialist to determine the feasibility of obtaining forensic images of electronic storage devices while onsite. The feasibility decision will be based upon the number of devices, the nature of the devices and the volume of data to be imaged. The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data or the safety of the agents. The number and type of computers and other devices and the number, type and size of hard drives are of critical importance. It can take several hours to image a single hard drive–the bigger the drive, the longer it generally takes. As additional devices and hard drives are added, the length of time that the agents must remain onsite can become overly

16

intrusive, dangerous and impractical.

b.      If it is not feasible to image the data on-site, the computer equipment and any peripherals will be seized and transported offsite for imaging. Once a verified image has been obtained, the owner of the equipment will be notified and the equipment returned within thirty (30) days of seizure absent further application to this court.

c.      A forensic image is an exact physical copy of the hard drive or other media. It is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. A forensic image captures all of the data on the hard drive or other media without the data being viewed and without changing the data in any way. This is in sharp contrast to what transpires when a computer running the common Windows operating system is started, if only to peruse and copy data–data is irretrievably changed and lost. Here is why: When a Windows computer is started, the operating system proceeds to write hundreds of new files about its status and operating environment. These new files may be written to places on the hard drive that may contain deleted or other remnant data. That data, if overwritten, is lost. In addition, every time a file is accessed, unless the access is done by trained professionals using special equipment, methods and software, the operating system will re-write the metadata for that file. Metadata is information about a file that the computer uses to manage information. If an agent merely opens a file to look at it, Windows will overwrite the metadata which previously reflected the last time the file was accessed. The lost information may be critical.

d.      Special software, methodology and equipment is used to obtain forensic images. Among other things, forensic images normally are "hashed," that is, subjected to a mathematical algorithm. The resulting number, known as a "hash value," confirms that the

17

forensic image is an exact copy of the original and also serves to protect the integrity of the image in perpetuity.

<u>Forensic Analysis</u>

e.      After obtaining a forensic image, the data will be analyzed.  Analysis of the data following the creation of the forensic image is a technical process that requires specific expertise, equipment and software.  There are thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user(s) computer system.  Computers are easily customized by their users.  Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage and security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze the imaged data.

f.      Analyzing the contents of a computer, in addition to requiring special technical skills, equipment and software, also can be very tedious.  It can take days to search a single hard drive for specific data.  Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process.  As mentioned above, the computer may have stored information about the data at issue: who created it, when it was created, when it was last accessed, when it was last modified, when it was last printed and when it was deleted.  Sometimes it is possible to recover an entire document that never was saved to the hard drive if the document was printed.  Moreover, certain file formats do not lend themselves to keyword searches.  Many common electronic mail, database and spreadsheet applications do not store data as searchable text.  The

18

data is saved in a proprietary non-text format.  Documents printed by the computer, even if the

document never was saved to the hard drive, are recoverable by forensic examiners but not

discoverable by keyword searches because the printed document is stored by the computer as a

graphic image and not as text.  Similarly, faxes sent to the computer are stored as graphic images

and not as text.

        g.      Analyzing data on-site has become increasingly impractical as the volume

of data stored on a typical computer system has become mind-boggling.  Computer hard drives

are now capable of storing more than 100 gigabytes of data and are commonplace in new desktop

computers.  And, this data may be encrypted or stored in a variety of formats.  The sheer volume

of data has extended the time that it takes to analyze data in a laboratory.  Running keyword

searches takes longer and results in more hits that must be individually examined for relevance.

Even perusing file structures can be laborious if the user is well-organized.

        h.      Based on the foregoing, searching any computer or forensic image for the

information subject to seizure pursuant to this warrant may require a range of data analysis

techniques and may take weeks or even months.  Keywords need to be modified continuously

based upon the results obtained; criminals can mislabel and hide files and directories, use codes

to avoid using keywords, encrypt files, deliberately misspell certain words, delete files and take

other steps to defeat law enforcement.  In light of these difficulties, your affiant requests

permission to use whatever data analysis techniques reasonably appear necessary to locate and

retrieve digital evidence within the scope of this warrant.

        i.      All forensic analysis of the imaged data will be directed exclusively to the

identification and seizure of information within the scope of this warrant.

19

## V.   REQUEST FOR SEALING

39.   Because this is an ongoing investigation, I request that this search warrant affidavit be sealed until such time as the Court orders otherwise.  Disclosure of the search warrant affidavit at this time would seriously jeopardize the ongoing investigation, as such disclosure would expose the scope of this investigation, and would provide the subjects an opportunity to destroy evidence, change patterns of behavior, or flee from prosecution.

Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this _____ day of April, 2009.

HONORABLE NITA L. STORMES
United States Magistrate Judge

20